**John MORRIS, Plaintiff,**

v.

**HIGHMARK LIFE INSURANCE COMPANY, f/k/a Trans–General Life Insurance Company and Group America Life Insurance Company, Defendant.**

**C.A. No. 01–396L.**

United States District Court,
D. Rhode Island.

April 8, 2003.

Annemarie M. Carney and Stephen M. Prignano, Edwards & Angell, Providence, RI, for Defendant.

Peter M. Iascone, Newport, RI, for Plaintiff.

## DECISION AND ORDER

LAGUEUX, Senior District Judge.

Plaintiff filed the present action in Rhode Island Superior Court alleging breach of contract and bad faith for failure to pay long-term disability benefits under plaintiff's employee benefit plan. Defendant removed the case to this Court and filed a motion for summary judgment. Plaintiff subsequently filed an amended complaint adding an ERISA count.

There are three issues currently before this Court. The first is whether this is an ERISA case. If it is an ERISA case, the second issue is whether plaintiff's bad faith claim is preempted by ERISA. The third issue is whether plaintiff's breach of contract claim is preempted by ERISA. This writer will address these issues seriatim.

After close examination of existing case law, this Court concludes that this is an ERISA case and that plaintiff's breach of contract and bad faith claims are preempted by ERISA. Therefore, this Court grants defendant's motion for summary judgment on those counts. As defendant did not move for summary judgment on plaintiff's ERISA count, that claim will be dealt with in due course.

## I. Background

John Morris ("plaintiff") filed this present action against Highmark Life Insurance Company ("defendant") in the Rhode Island Superior Court on July 17, 2001 alleging breach of contract for failure to pay long-term disability benefits pursuant to a disability insurance contract issued to him through his former employer, Griggs & Browne. Plaintiff also alleges defendant acted in bad faith in denying those benefits. After unsuccessfully appealing defendant's decision to deny the benefits through an internal review process, plaintiff brought this action seeking damages and attorneys fees pursuant to R.I. Gen. Laws § 9–1–33 (1997).

Plaintiff filed a claim for disability benefits with defendant after he was injured in a motor vehicle accident on January 13, 1996. Soon after the accident, plaintiff underwent a cervical discetomy and fusion. Plaintiff alleges that he continues to suffer from neck pain, headaches, and sleep deprivation as well as from depression and decreased concentration as a result of the pain. Plaintiff asserts that the injury left him permanently impaired as defined by the American Medical Association Guidelines on Permanent Impairment and that his treating surgeon has indicated that plaintiff is unable to return to work as a pest control technician on account of being completely disabled. Defendant, however, contends that plaintiff's treating physician claimed that the surgery was successful and that as a result of that medical opinion, plaintiff is able to work. Defendant points to the fact that plaintiff was denied Social Security benefits.

After plaintiff filed his complaint, defendant removed the case to this federal court on August 22, 2001 on the basis of diversity jurisdiction and federal question jurisdiction contending that the case is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (2000) ("ERISA"). Defendant claims that although it allowed plaintiff to supplement the claim file with additional medical evidence during the internal appeal process, neither the initial record nor the supplementary medical information provided any objective support for plaintiff's disability claim. As a result, defendant asserts that it properly denied plaintiff's claim for benefits. The claim was denied initially, on appeal and after three reconsiderations. Defendant now contends that plaintiff's benefits package

is governed by ERISA, and that as such, plaintiff's remedies are limited to those provided by ERISA's remedial scheme.

Although plaintiff did not assert an ERISA count in his original complaint, this Court granted plaintiff leave to amend the complaint. Plaintiff filed the amended complaint alleging an ERISA count on October 21, 2002. At this time, however, this Court need only consider defendant's motion for summary judgment on the state breach of contract and bad faith claims, because defendant did not seek summary judgment on the ERISA count.

## II. Discussion

### A. Jurisdiction

Plaintiff brought this action in the Rhode Island Superior Court on July 17, 2001 alleging state law claims of bad faith and breach of contract. On August 22, 2001, defendant removed the case pursuant to this Court's federal question jurisdiction and diversity jurisdiction.

 Ordinarily, "federal *defenses* including preemption do not by themselves confer federal jurisdiction over a well-pleaded complaint alleging only violations of state law." *Hotz v. Blue Cross and Blue Shield of Massachusetts, Inc.*, 292 F.3d 57, 59 (1st Cir.2002)(emphasis in original). Thus, a defendant usually would be required to rely on diversity jurisdiction for removal purposes in a case such as this. Nevertheless, the doctrine of complete preemption is applicable here. The First Circuit in *Danca v. Private Health Care Systems, Inc.*, 185 F.3d 1, 4 (1st Cir.1999) explained that when a state law claim "implicates an area of federal law for which Congress intended a particularly powerful preemptive sweep, the cause is deemed federal no matter how pleaded." Under the civil enforcement provisions of ERISA, federal removal jurisdiction is permitted "over any state law claims that in substance seek relief that is otherwise within the scope of those ERISA remedy provisions." *Hotz*, 292 F.3d at 59.[1] Thus, the complete preemption doctrine applies to a state law suit alleging bad faith and breach of contract for the improper processing of a benefits claim under an ERISA plan. *Danca*, 185 F.3d at 5. Defendant, therefore, properly removed the present case to federal court.

### B. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on summary judgment motions:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The critical inquiry is whether a genuine issue of material fact exists. A genuine issue is one "supported by such evidence that a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party." *Hershey v. Donaldson, Lufkin & Jenrette Securities Corp.*, 317 F.3d 16, 19 (1st Cir.2003)(internal quotation marks omitted). Furthermore, a material fact is "one that might 'affect the outcome of the suit under the governing law.'" *United States v. One Parcel of Real Property*, 960 F.2d

---

1. Defendant filed its motion for summary judgment on August 20, 2002. At the time of the filing, only state law counts were pending before this Court. Nevertheless, on October 21, 2002, plaintiff filed an amended complaint alleging an ERISA claim. Consequently, this Court now has federal question jurisdiction over the ERISA claim in addition to the state claims previously discussed.

200, 204 (1st Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

On a motion for summary judgment, the moving party bears the initial burden of showing that there are no genuine issues of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden may be met by showing the court that a lack of evidence exists to support the nonmoving party's case. *Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 39 (1st Cir. 2002). Upon discharging that burden, the nonmoving party must demonstrate that the trier of fact could reasonably find in the nonmoving party's favor with respect to each issue on which that party has the burden of proof at trial. *Id.* In the end, the court must view all evidence and related inferences in the light most favorable to the nonmoving party. *Id.* "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir.1995). Indeed, as this writer has explained, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.*, 777 F.Supp. 167, 169 (D.R.I. 1991).

**B. The Statutory Background of ERISA**

An employee benefit plan under ERISA includes an employee welfare benefit plan, an employee pension benefit plan or a plan that is both a welfare benefit and a pension benefit plan. 29 U.S.C. § 1002(3) (2000). An employee welfare benefit plan is a plan, fund or program which is established and maintained by an employer for the purpose of providing certain health care benefits, such as disability benefits, to the program's participants or beneficiaries. *Id.* § 1002(1). In the case at bar, plaintiff's group health insurance policy offered long term disability benefits, and thus the policy is a welfare benefit plan under ERISA provided the policy was established or maintained by plaintiff's employer. *Id.*

As the First Circuit has discussed, no single act of the employer by itself is dispositive of whether an employer has established a plan, fund or program. *Demars v. CIGNA, Corp.*, 173 F.3d 443, 446 (1st Cir.1999). No "authoritative checklist" exists for a court to consult in order to determine whether an employer has established an ERISA program. *Belanger v. Wyman–Gordon Co.*, 71 F.3d 451, 455 (1st Cir.1995). Nevertheless, if a reasonable employee would "perceive an ongoing commitment by the employer to provide employee benefits" in light of existing facts and circumstances, then an ERISA plan is likely to exist. *Id.* That is, a court must determine whether the offering of the employee benefit was an express intention on the part of the employer to provide benefits on an ongoing long-term basis. *Id.* This express intention may be manifested by the employer's "undertaking of continuing administrative and financial obligations." *New England Mut. Life Ins. Co., Inc. v. Baig*, 166 F.3d 1, 3 (1st Cir.1999)(quoting *Belanger*, 71 F.3d at 454.). *See also D'Oliviera v. Rare Hospitality Intern., Inc.*, 150 F.Supp.2d 346, 351 (D.R.I.2001)(This writer explaining that "the main inquiry is whether the plan in question relies on an ongoing administrative process for implementation.").

In the present case, an affidavit from Highmark employee, Laurie Roth, indicates that Griggs & Browne entered into a contract with Highmark in order to offer Griggs & Browne employees the benefits plaintiff now claims. (Def.'s Mem.

Summ. J. at 5.) Furthermore, plaintiff received a discount on his policy premiums on account of his employment with Griggs and Browne. (*Id.*) Griggs & Browne also contributed toward plaintiff's premiums, and as a result, he enjoyed a higher level of coverage because of his employment with the company. (*Id.*) Plaintiff's own deposition testimony further supports the conclusion that Griggs & Browne established and maintained an employee benefit plan in accordance with ERISA's statutory requirements. (*Id.*) Plaintiff acknowledged in his deposition that he received a policy application from Griggs & Browne, that the application offered benefits to its employees and that the company contributed toward the premium payments while simultaneously offering a payroll deduction service to its employees. (*Id.*) Finally, plaintiff testified in his deposition that the benefits package offered by Griggs & Browne was the primary reason why he sought employment with the company. (*Id.* 5–6.)

Taking into account Roth's affidavit in addition to plaintiff's own deposition testimony, it is evident that the long term disability group policy to which plaintiff belonged was part of a benefits package established and maintained by Griggs & Browne. As a result, the disability policy is part of an "employee benefit plan" as defined by ERISA. Thus, the remedial structure provided by ERISA is applicable to the present case.

### C. The Preemption Framework

Approximately thirty years before Congress enacted ERISA with its accompanying saving clause provision, Congress passed the McCarran–Ferguson Act, 15 U.S.C. § 1011 (2000), in order to protect the ability of the States to "tax and regulate the business of insurance." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 744 n. 21, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985)(internal quotation

marks omitted). The McCarran–Ferguson Act provides that "the continued regulation and taxation by the several States of *the business of insurance* is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 15 U.S.C. § 1011 (emphasis added). Congress enacted the McCarran–Ferguson Act primarily because it was concerned with "the type of state regulation that centers around the contract of insurance . . . .[t]he relationship between insurer and insured, *the type of policy which could be issued,* its reliability, its interpretation, and enforcement. . . . Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the business of insurance." *Metropolitan Life*, 471 U.S. at 743–744, 105 S.Ct. 2380 (italics in original)(internal quotation marks omitted). In order to reinforce the ability of the States to regulate the "business of insurance" as stipulated by the McCarran–Ferguson Act, Congress used comparable wording in the ERISA saving clause by providing that "any law of any State which regulates insurance" will not be preempted by federal law. *Id.* at 744 n. 21, 105 S.Ct. 2380. Thus, while both the McCarran–Ferguson Act and the saving clause were crafted so as to spare comparable state legislation from federal preemption, precisely what type of legislation should be spared is still an open question. The statutes themselves provide little insight into what the phrases "business of insurance" and "regulates insurance" mean on a practical level.

■ As a result, the Supreme Court over the years has assumed the responsibility of flushing out the substantive meaning behind ERISA's statutory preemption provisions, particularly when the saving clause has been at issue. *See, e.g., UNUM*

*Life Ins. Co. of Am. v. Ward,* 526 U.S. 358, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Metropolitan Life Ins.,* 471 U.S. at 732, 105 S.Ct. 2380. The Court stressed in *Pilot Life* that "the express pre-emption provisions of ERISA are deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.'" 481 U.S. at 45–46, 107 S.Ct. 1549 (quoting *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981)). Despite the statute's broad reach, however, Congress did not intend for all state laws affecting employee benefit plans to fall victim to ERISA preemption. In fact, the saving clause of 29 U.S.C. § 1144(b)(2)(A) (2000) protects from ERISA preemption any state law that regulates insurance. Nevertheless, the saving clause does not exist in isolation; rather, it is part of a much larger regulatory scheme. *Pilot Life,* 481 U.S. at 51, 107 S.Ct. 1549 (explaining that a court "must not be guided by a single sentence ... but [must] look to the provisions of the whole law, and to its object and policy.").

▮ In order to determine whether a state statute falls within the saving clause of ERISA, the state statute in question must pass a two part analysis. This analysis begins with the "common sense" test to determine whether the statute "regulates insurance." *Metropolitan Life,* 471 U.S. at 740, 105 S.Ct. 2380. Then, the three factors laid out in *Metropolitan Life* must be considered in order to determine whether the state law regulates the "business of

insurance" as required by the McCarran–Ferguson Act. *Id.* at 743, 105 S.Ct. 2380. Nevertheless, even if the state statute passes this two part analysis, the statute may still be subject to ERISA preemption. Congress intended for ERISA's civil enforcement scheme to be exclusive in order to avoid the burdens that differing state regulations would impose on ERISA's system for processing claims and paying benefits. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 105, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Thus, if the statute interferes with Congress' express intention that ERISA's civil enforcement scheme be the exclusive vehicle through which plan participants and beneficiaries can sue for benefits denied by their insurers, the statute will not gain the protection of ERISA's saving clause. *See Pilot Life,* 481 U.S. at 52, 107 S.Ct. 1549.

### D. Rhode Island's Bad Faith Statute

▮ Since the insurance policy at issue is governed by ERISA's statutory requirements, this Court must determine whether plaintiff's state law causes of action are preempted. Consequently, this Court first considers whether Rhode Island's bad faith statute "regulates insurance" under the common sense view. Under this portion of the analysis, a state law must be "specifically directed toward that industry." *Pilot Life,* 481 U.S. at 50, 107 S.Ct. 1549. A mere impact on the insurance industry is not sufficient to avoid preemption under ERISA. *Id.*[2] In order to determine whether a state law is specifi-

---

2. Rhode Island's bad faith insurance statute provides in relevant part:

 (a) Notwithstanding any law to the contrary, an insured under any insurance policy as set out in the general laws or otherwise may bring an action against the insurer issuing the policy when it is alleged the insurer wrongfully and in bad faith refused to pay or settle a claim

made pursuant to the provisions of the policy, or otherwise wrongfully and in bad faith refused to timely perform its obligations under the contract of insurance. In any action brought pursuant to this section, an insured may also make claim for compensatory damages, punitive damages, and reasonable attorney fees. § 9–1–33.

cally directed at the insurance industry, a court must consider whether the statute has its roots in common law principles of tort or contract law, or whether the law sets forth a mandatory rule for insurance contracts. *Id.; Ward*, 526 U.S. at 371, 119 S.Ct. 1380.

The Supreme Court in *Pilot Life* discussed whether Mississippi's bad faith law was a law which directly targeted the insurance industry. The Court stated that "[e]ven though the Mississippi Supreme Court has identified its law of bad faith with the insurance industry, the roots of this law are firmly planted in the general principles of Mississippi tort and contract law." *Id.* It could be argued, therefore, that had the law in *Pilot Life* involved an insurance bad faith law instead of a generally applicable bad faith provision, the Court might have concluded that, under the common sense view, the Mississippi law was directed at the insurance industry. Indeed, at first blush, it appears that, unlike the Mississippi law, Rhode Island's bad faith statute directly targets the insurance industry. The title of the statute itself appears to compel this conclusion, because the title states that the statute applies to insurers who have denied claims in bad faith.[3] *See* § 9–1–33.

The Seventh Circuit, however, has previously considered this argument. In *Smith v. Blue Cross & Blue Shield United of Wisconsin*, 959 F.2d 655, 657 (7th Cir. 1992), the plaintiff attempted to convince the circuit that *Pilot Life* did not apply to Wisconsin's bad faith common law, because unlike the general bad faith statute in *Pilot Life*, Wisconsin's law of bad faith was specifically directed at the insurance industry. The Seventh Circuit, however, concluded that the "distinction [could] not be maintained . . . .[because] Wisconsin's

law of bad faith is similarly planted in the general principles of . . . tort and contract law." *Id.* (internal quotation marks omitted).

This writer agrees. To assert that a bad faith statute escapes its roots in the common law simply because the word "insurance" appears in its title defies common sense. A state legislature cannot sidestep congressional intent, by merely inserting the word "insurance" into the title of a state statute. To do so would undermine the very essence of ERISA and its remedial structure. Thus, this Court holds that the insertion of the word "insurance" into the title of a bad faith statute cannot protect from ERISA preemption what is otherwise a common law cause of action.

■■■ As for the three factors interpreting the phrase "business of insurance" in the McCarran–Ferguson Act, a court must consider (1) whether the state law has the effect of spreading a policyholder's risk, (2) whether the state law constitutes an integral part of the policy relationship between the insurer and the insured, and (3) whether the law is limited to entities within the insurance industry. *Pilot Life*, 481 U.S. at 48–49, 107 S.Ct. 1549. The Supreme Court recently noted, however, that the factors are only "guideposts;" as a result, a state law need not satisfy all three criteria in order to survive preemption. *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 372, 122 S.Ct. 2151, 2163, 153 L.Ed.2d 375 (2002).

In *Metropolitan Life*, the Supreme Court concluded that the Massachusetts statute, Mass. Gen. Laws c. 175 § 47B (1998), adhered to the "business of insurance" requirement in the McCarran Ferguson Act. In short, § 47B requires an

**3.** Section 9–1–33 is entitled, "Insurer's bad faith refusal to pay a claim made under any

insurance policy."

insurer of a general health insurance policy, an accident or sickness policy, or an employee health care plan which covers hospital and surgical expenses to provide certain specified minimum mental health care benefits to its policyholders. *Id.* at 727, 105 S.Ct. 2380. The Court concluded that § 47B satisfied the first McCarran–Ferguson factor, because the section "intended to effectuate the legislative judgment that the risk of mental health care should be shared." *Id.* at 743, 105 S.Ct. 2380. As the Tenth Circuit explained in a case mirroring the one at bar, the mandated benefits in *Metropolitan Life* affected the spreading of risk, because the law required that a certain disease be covered under the health insurance contracts. *See Gaylor v. John Hancock Mut. Life Ins. Co.*, 112 F.3d 460, 466 (10th Cir.1997). This means that the mandated benefits spread the risk from the insured to the insurers and among the insureds themselves. *Id.*

Unlike mandated benefits, however, a bad faith insurance statute does not spread any risk among policyholders. A bad faith law does not bring about a "change in the risk borne by insurers and the insured, because it does not affect the substantive terms of the insurance contract." *Id.* There is simply no indication that an insurance bad faith statute intends for any risk of medical care to be shared. Thus, Rhode Island's bad faith insurance law does not satisfy the first McCarran–Ferguson factor.

As for the second factor, in *Metropolitan Life* the Court concluded that mandated benefit laws regulate an integral part of the relationship between the policyholder and insurer, because mandated benefit laws limit the type of insurance an insurer can sell to a policyholder. 471 U.S. at 743, 105 S.Ct. 2380. In the case of a bad faith statute, however, the policy relationship is affected only to the extent that, under certain circumstances, the policyholder can obtain punitive damages in the event of a breach. *Pilot Life*, 481 U.S. at 51, 107 S.Ct. 1549. The Eight Circuit in *Howard v. Coventry Health Care, of Iowa, Inc.*, 293 F.3d 442 (8th Cir.2002) agreed. That circuit concluded that a bad faith law does not regulate insurance because it "does not dictate what bargains the insurer and insured may or may not reach; rather, it merely provides the insured with an extra remedy to [e]nsure the insured receives the benefit of its bargain." *Id.* at 447. Rhode Island's common law prohibiting bad faith, therefore, is "no more 'integral' to the insurer-insured relationship than any States' general contract law is integral to a contract made in that State." *Pilot Life*, 481 U.S. at 51, 107 S.Ct. 1549. Furthermore, the Rhode Island law is not integral to the insurance industry, because, unlike mandated benefits, the concept of bad faith stems from common law tort and contract principles. *Id.*

Finally, with respect to the third McCarran–Ferguson factor, the Supreme Court in *Metropolitan Life* concluded that the Massachusetts statute imposed a duty only on insurers to provide the requisite benefits. 471 U.S. at 743, 105 S.Ct. 2380. It is indisputable that in the present case, the Rhode Island statute is limited to entities within the insurance industry. The fact that the word "insurance" appears in the title demonstrates the statute's limited application. Nevertheless, the mere fact that the word "insurance" appears in the title does not support the conclusion that the Rhode Island statute regulates the business of insurance under the McCarran–Ferguson Act.

Moreover, even if this Court were to conclude that Rhode Island's bad faith statute regulates insurance under a common sense view and that it regulates the business of insurance as required by the

McCarran–Ferguson Act, the state statute would still be preempted by ERISA, because it interferes with congressional policy. *See Rush,* 536 U.S. at 375, 122 S.Ct. at 2165 (explaining that the saving clause must "stop short of subverting congressional intent."). The Supreme Court in *Pilot Life* noted that ERISA's civil enforcement scheme balances "the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." 481 U.S. at 54, 107 S.Ct. 1549. The Court explained that Congress deliberately included certain remedies in the statute while intentionally excluding others. *Id.* The Court emphasized that ERISA's civil enforcement scheme would be severely undermined if plaintiffs were permitted to seek state law remedies which Congress did not include in ERISA. *Id.* Indeed, there is a "presumption that a remedy was deliberately omitted from a statute ... when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." *Id.* (internal quotation marks omitted) According to the Supreme Court, one remedy which Congress intentionally excluded from ERISA's remedial scheme was punitive damages. *Id.* Thus, the punitive damage remedy that the Rhode Island legislature included in its bad faith statute directly conflicts with congressional intent. Consequently, in order to ensure that ERISA's comprehensive remedial scheme remain the exclusive vehicle through which plan participants and beneficiaries can sue for benefits, this Court holds that ERISA preempts Rhode Island's bad faith insurance statute.

Finally, it must be noted that a majority of the circuits and numerous district courts have addressed the issue that now faces this Court.[4] The Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits have all explicitly stated that bad faith statutes are preempted by ERISA, regardless of whether those statutes are generally applicable or directed at the insurance industry per se.[5] Although the First Circuit has not addressed the question of insurance bad faith statutes specifi-

4. Plaintiff correctly points out that the Supreme Court has ruled that ERISA preemption is not exclusive and that state statutes which regulate insurance, such as state notice-prejudice rules, escape ERISA preemption. *See Ward,* 526 U.S. at 376–77, 119 S.Ct. 1380. Nevertheless, notice-prejudice statutes are not bad faith insurance statutes, and thus, this Court declines to extend the holding of *Ward* to the case at bar.

5. *See, e.g., Conover v. Aetna U.S. Health Care Inc.,* 320 F.3d 1076, 1079 (10th Cir.2003)(applying Oklahoma law); *Caffey v. UNUM Life Ins. Co.,* 302 F.3d 576, 582 (6th Cir.2002); *Howard,* 293 F.3d at 447 (applying Iowa law); *Walker v. Southern Co. Services, Inc.,* 279 F.3d 1289, 1293, (11th Cir.2002)(applying Alabama law); *Crull v. GEM Ins. Co.,* 58 F.3d 1386, 1391 (9th Cir.1995)(explaining that claims of insurance including bad faith are preempted in keeping with Congress' intent that ERISA's civil enforcement scheme be exclusive.); *Smith v. Blue Cross & Blue Shield United of Wisconsin,* 959 F.2d 655, 658 (7th Cir.1992)(applying Wisconsin law); *Perkins v. Time Ins. Co.,* 898 F.2d 470, 473 (5th Cir.1990)(stating that "ERISA clearly preempts claims of bad faith as against insurance companies for improper processing of a claim for benefits under an employee benefit plan."). *See also Bell v. UNUMProvident Corp.,* 222 F.Supp.2d 692, 700 (E.D.Pa.2002)(explaining that a claim alleging a breach of the duty to act in good faith was preempted by ERISA.); *Buote v. Verizon New England,* 190 F.Supp.2d 693, 704 (D.Vt.2002)(explaining that " 'state laws' under [ERISA] ... include state statutes as well as state common law causes of action, such as torts for improper handling of benefits."); *Allison v. Continental Cas. Ins. Co.,* 953 F.Supp. 127, 129 (E.D.Va.1996)(explaining that "it is well settled that common law claims which relate to employee benefits plans consistently have been held to be preempted by ERISA. It follows that the common law claim of bad faith is preempted as well.")

cally, the Circuit has held that state statutes prohibiting unfair claim settlement practices by insurance companies are preempted under ERISA despite the saving clause. *Hotz,* 292 F.3d at 60–61. Likewise, the Circuit has concluded that state law tort claims for negligence are preempted under ERISA. *Danca,* 185 F.3d at 7. The First Circuit has noted that "generally speaking, federal substantive law and not state law will govern a *claim for benefits* under ERISA." *Nash v. Trustees of Boston University,* 946 F.2d 960, 964 n. 8 (1st Cir.1991)(emphasis in original). Thus, although the First Circuit has not discussed the issue of bad faith statutes, given that numerous courts have adhered to the Supreme Court's reasoning in *Pilot Life* and in light of the decisions the First Circuit has reached in comparable ERISA cases, this Court has little doubt that the First Circuit will hold that ERISA preempts Rhode Island's bad faith insurance statute.[6]

### E. Breach of Contract

■ This Court need not engage in an elaborate analysis regarding plaintiff's breach of contract claim, for few causes of action have their roots as deeply imbedded in the common law as an ordinary breach of contract claim. Thus, the analysis this Court has undertaken to assess whether the saving clause applies to Rhode Island's bad faith insurance statute also applies to plaintiff's breach of contract claim. Therefore, in light of the above analysis, this Court holds that plaintiff's breach of contract claim is likewise preempted by ERISA.

---

6. Although the First Circuit has not addressed the issue of state law bad faith claims, the District Court of Massachusetts has concluded that "actions asserting bad faith in handling [insurance] claims are not deemed to be di-

### III. Conclusion

For the aforementioned reasons, defendant's motion for summary judgment is granted as to plaintiff's breach of contract and bad faith claims. As defendant did not move for summary judgment on plaintiff's ERISA count, that claim will take its normal course.

No judgment shall enter until all claims are resolved.

It is so ordered.

rected to the regulation of insurance, and are preempted." *Andrews–Clarke v. Lucent Technologies, Inc.,* 157 F.Supp.2d 93, 106 (D.Mass.2001).